

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

_____

No. 07-18-00141-CV
_____

IN THE INTEREST OF A.M., A CHILD

_____

On Appeal from the County Court at Law No. 1
Randall County, Texas
Trial Court No. 10,995-L1, Honorable Jack M. Graham, Presiding

_____

August 9, 2018

MEMORANDUM OPINION

Before CAMPBELL and PIRTLE and PARKER, JJ.

Following a bench trial, the trial court signed a judgment terminating the parent-child relationship between W.M. and his daughter, A.M.[1] W.M. challenges the legal and factual sufficiency of the evidence supporting the grounds for termination of his parental rights. We affirm the judgment of the trial court.

---

[1] To protect the privacy of the parties involved, we will refer to them as follows: appellant father, W.M.; the child, A.M.; the child's half-siblings, H.G., N.M., S.M., and E.M.; appellant's wife and stepmother of the child, D.F.; the child's mother, B.A.; the child's former foster mother, "Angie," and the child's paternal aunt, "Kathy." *See* TEX. FAM. CODE ANN. § 109.002(d) (West Supp. 2017); TEX. R. APP. P. 9.8(b).

BACKGROUND

W.M. and D.F. are the parents of H.G., eight years old; N.M., two years old; and six-month-old twins, S.M. and E.M.  W.M. is also the father of A.M., who is four years old.  The mother of A.M. is B.A.  According to W.M., he and B.A. separated in 2014 "because of the neglect and very poor taking care of my daughter."[2]  A.M. began living with W.M. and D.F. when A.M. was eighteen months old.

From August 2016 until December 2016, W.M. and D.F. took A.M. to counseling with Louva Hunt, a licensed professional counselor, with concerns about A.M.'s behavior.  They reported that A.M. threatened to kill herself and her sister, and that she put a cat in a clothes dryer and it died.  D.F. related that A.M. gets angry and has an "evil look across her face."  There were also concerns about her bedwetting and drinking out of the toilet.  Hunt was unable to corroborate any aggressive behavior W.M. and D.F. described.  Hunt observed that A.M. was shy and sweet.  Hunt noted that W.M. and D.F. had conflicts in parenting.  W.M. acknowledged that he and D.F. disagreed on how to discipline A.M.  D.F. said, "I tell my children what to do and they do it, and I expect [A.M.] to do the same."  Hunt requested that W.M. and D.F. provide her a list of specific examples of behavior issues that they noticed and to provide records from the school A.M. attended so that Hunt could formulate a treatment plan but nothing was provided.

On February 23, 2017, D.F. called W.M. at work to let him know that A.M. scalded her hand trying to wash her hands.  W.M told D.F. to run cold water over the burn and

---

[2]  W.M. and B.A. received Family Based Safety Services (FBSS) from the Department of Family and Protective Services in 2014 because of alleged prescription drug abuse by B.A.  During the investigation, W.M. was validated for neglectful supervision due to both B.A. and W.M. testing positive for marijuana.  W.M. completed his services during the FBSS case.

apply mustard to A.M.'s hand. When W.M. got home, A.M. was sitting on the kitchen sink and D.F. was treating A.M.'s burn. A.M. "was not crying in excruciating pain." "She was just sniffling" and she told W.M. the burn "just hurts a little bit." W.M. said the burn "looked like a sunburn, a little red." Instead of taking A.M. to the emergency room, W.M. and D.F. decided to see how it "progressed if we felt she was in enough pain to have to go to the ER. We looked up things online" about how to treat it. W.M. treated his burns in the past with mustard, honey, and black tea. W.M. claimed that after they removed the mustard, A.M. told him "it did not hurt at all." In addition to mustard, W.M. and D.F. treated A.M.'s hand with cool black tea, honey, and burn gel that W.M. purchased at Walmart. They wrapped her hand with gauze and put a bag over it to keep the air off of it.

W.M. returned to work after he determined that A.M "was not in dire need to go to the hospital." He said that when he returned home later that night, A.M. was "feeling good." W.M. did not look at A.M.'s hand the day after it was burned. D.F. testified that A.M. appeared to be in "some" pain and would verbalize the pain if she was trying to use her hand those first few days. At trial, W.M. claimed that he and D.F. gave A.M. Motrin for pain—"probably every four hours, four to six hours."

On the afternoon of February 27, 2017, D.F. took A.M. for her four-year-old well-check at Amarillo Pediatric Clinic. Julie Reel, a nurse practitioner at the clinic, has known D.F. for two to three years because all of D.F.'s children and A.M. have established care at the clinic. Reel was aware that D.F. and W.M. argued about A.M. and that they were in family counseling because of "the family drama and dynamics with A.M." The only behavioral concern that Reel addressed with D.F. before this well-check was A.M.'s bedwetting.

3

During the well-check, Reel noticed a scratch on A.M.'s face. D.F. said that N.M. "was pretty rough with her and that's where the scratch came from." D.F. did not mention that A.M. had sustained a burn. Reel testified that A.M. was "very quiet and just kind of withdrawn." "She was sitting on the edge of the table, and she was just kind of rocking back and forth." Reel noticed that A.M.'s hand was wrapped and saw "the outside of the hand completely reddened up to a specialized demarcation of maybe possibly where she had a sleeve or something on and blisters had popped." A.M. appeared to be in pain. Reel "knew that that type of burn would hurt." When Reel asked A.M. if it hurt, A.M. "just kind of squeezed her eyes and looked at me with big tears, and she just shook her head yes." A.M. was holding her breath at times because she was in so much pain. D.F. told Reel that A.M. was playing with the hot water in the tub and turned it on. "[D.F.] said she has told [A.M.] a thousand times not to turn on the hot water without [D.F.] being there, but [A.M.] turned on the hot water and burned her own hand." D.F. said that she wanted to take A.M. to the emergency room but W.M. said "we can just treat it with tea bags and honey." Reel testified that "there was no way that I could touch it without A.M. wincing in pain." D.F. said, "I have Tylenol at home, but she didn't act like it hurt, so I didn't give her any." Reel gave A.M. ibuprofen to make her more comfortable and put a light gauze over A.M.'s hand. Then Reel arranged for A.M. to be taken immediately to the burn unit in Lubbock for treatment. Reel testified that failing to obtain medical treatment immediately for A.M. endangered A.M.'s physical health or emotional well-being. The high risk of infection and the pain level can "definitely hurt a child's emotional stability" according to Reel.

The Department of Family and Protective Services (Department) became involved with A.M. after she was admitted to University Medical Center burn unit in Lubbock. She

4

had a severe burn with popped blisters on the top of her right hand.[3]  A.M. was given morphine for pain.  She told the medical staff that her brother turned the hot water on while she was taking a bath.  A.M. later told a nurse that she was washing her hands when she was hurt.  D.F. told medical staff that A.M. placed her hand under hot water and it scalded her.  She also told medical staff the hot water heater was turned up to its highest setting[4] and "has since been turned down."  D.F. explained that the scratches on A.M. were from her little brother who plays very rough with her.

Dr. Patti Patterson, a board-certified pediatrician, professor of pediatrics at Texas Tech University School of Medicine and director of child abuse pediatrics for the Lubbock region, evaluated A.M. at the request of the burn unit trauma team.  Dr. Patterson reviewed the photographs of A.M.'s hand that were contained within A.M.'s medical records.  The photographs depict a second degree burn on the back of A.M.'s hand with a very clear, straight mark across the wrist.  The pictures show a burn that "would hurt a lot" with reddening and "some areas that look deeper."

Patterson explained that hand burns are complicated because of the intricate muscles in the fingers.  Scarring or infection in the hand muscles can result in permanent disability in the fingers and the "risk of losing function."  The risk of infection due to lack of proper treatment could endanger a child. The time between the burn and the admission to the hospital was concerning to Patterson because of A.M.'s pain and the risk of infection without proper treatment.

---

[3] Medical staff noted that A.M. had bruising of differing ages on her legs, left hand, and left side of her face.  A.M., W.M., and D.F. were unsure how she obtained bruising on these areas of her body.

[4] W.M. testified that he checked the temperature of the hot water in the hot water heater with his grill thermometer after A.M. was burned and it "was around 140 degrees."

When Dr. Patterson saw the child, she was on pain medication, but prior to that she would have been in "bad pain." Tylenol would not have alleviated her pain. The child would have had trouble in her daily functioning as a result of the burn during the first few days due to the level of pain. The child would not have been using the hand regularly during this stage of the injury.

Dr. Patterson could not say whether the application of mustard and black tea to the injury would have helped it or made it worse, but "it would have been a lot better to go ahead and get appropriate medical care." Patterson stated that a reasonable parent would have sought medical care.

According to W.M. and D.F., A.M. was "washing her hands and hit the hot water." That description was of concern to Dr. Patterson because:

> The photograph shows that the—the demarcation of where the burn stops on the wrist is very straight. You expect with sort of a burn that's from a running faucet that it would splash, and so you wouldn't have a straight mark. It would be jagged. You can even have splash marks up the arm. So to me it—it didn't look like what was described.

Patterson explained that handwashing burns are not common because "your instinct is to jerk your hand back if the water is too hot." If the injury occurred as described by W.M. and D.F., A.M. would have "jerked her hand back immediately." A clear line of demarcation is indicative of an immersion burn "where a hand is put down into something hot. I have seen it with a flow, but more of where the—the extremity is held there."

Patterson concluded that A.M.'s burn was "most likely an inflicted injury" and she was "concerned for the safety of the child." Her opinion that it was an inflicted injury was

6

based on the pattern of the burn and that "it really wasn't consistent at all with the history that I've been provided."

On March 2, 2017, W.M. and D.F. wanted to take A.M. out of the hospital and treat her at home with over-the-counter medication. Patterson testified that removing A.M. from medical treatment at that time would have endangered A.M.'s physical health or emotional well-being. According to Patterson, A.M. sustained a severe burn that should have been treated immediately by medical professionals. Failing to obtain medical treatment for the severe burn and failing to administer pain medication constituted endangerment to A.M.'s physical health or emotional well-being.

Concerned that W.M. would remove A.M. from the hospital in Lubbock prompted the Department to pursue emergency removal of A.M. due to medical neglect. Following an adversary hearing, the Department was appointed temporary managing conservator and A.M. was placed in a foster home in Lubbock that could facilitate A.M.'s need for wound care and follow-up appointments with the medical staff at U.M.C.

On March 5, 2017, A.M. told Angie, her foster mother, that D.F. "had burned her hand." A.M. told Angie that D.F. "held her hand under the hot water," "turned on the hot water, turned it off and turned it back on and then turned it off again."

At random times while out with Angie in a public setting, someone A.M. did not know would see her hand bandaged and ask A.M., "Did you break your arm?" and A.M. would say, "Well, no, my mom burned me." Angie reported A.M.'s statements to the police on March 23, 2017.

Lieutenant Chappell with the Amarillo Police Department supervised the criminal investigation of D.F. and W.M. for A.M.'s burn. On April 3, 2017, a search warrant was executed at the home of W.M. and D.F. to check the water temperatures and to search cellphones for evidence. Photographs of the home were taken. The room identified as A.M.'s bedroom had a couple of dogs in it and dog feces on the floor. The closet in A.M.'s room contained six of her Christmas presents, unopened.

During Chappell's interview of D.F., D.F. admitted that she held A.M.'s hand under the hot water. D.F. told Chappell that they were getting ready to eat and A.M. had poop on her hands after using the restroom and "it was disgusting." D.F. was holding N.M. in one arm, and D.F. "turned the hot water on and tried to get [A.M.] to wash her hands but she doesn't want to wash her hands." D.F. admitted that she held A.M.'s hand under the hot water for "a couple of seconds" before she pulled her hand out.[5]

H.G. was interviewed on April 27, 2017, as part of the investigation of A.M.'s suspected abuse. The interview was conducted by Lee Ann Almond, a forensic interviewer at The Bridge Children's Advocacy Center. H.G. described how W.M. and D.F. used hot sauce and peppers to discipline A.M. for lying:[6]

> My sister [A.M.] lies a lot so, so she took a whole jar of hot sauce which um she wouldn't stop lying about it . . . so she had to take lots of spoons of it . . . . Sometimes my mom is cooking dinner while my dad is giving her hot sauce . . . . We even had some peppers for [A.M.] . . . because um sometimes the hot sauce doesn't work so we had to use um peppers.

---

[5] On May 17, 2017, a Randall County grand jury indicted D.F. for one count of injury to a child and one count of endangering a child. W.M. was indicted for endangering a child. Criminal charges were pending at the time of trial.

[6] After H.G.'s forensic interview, the Department was granted temporary managing conservatorship of H.G., N.M., S.M., and E.M. on April 28, 2017.

H.G. also demonstrated how A.M. is held by W.M. and D.F. when she is given hot sauce and peppers.

> Sometimes my mom gets tired of holding her while my dad um puts--puts the hot sauce in her mouth so my dad has to hold her . . . because she fights with my mom . . . .  My mom is holding her like the babies . . . but she's grabbing her tighter because [A.M.] likes to get off of her arms because she goes to run away outside or to play outside . . . .  Dad holds her like a baby too but tighter like my mom . . . .  He puts it in the lid and puts it in [A.M.'s] mouth . . . [A.M.] cries and tries to spit it out but she's already swallowed it . . . [A]nd sometimes she spits it out before she's swallowed it and she gets another lid full.
>
> Sometimes [A.M.] doesn't cry about the hot sauce . . . .  When she lies and um she--she tries to fight for the hot sauce my mom says just give her the peppers . . . .  She has to chew them and so we had to hold her back . . . drop it in her mouth . . . and then she chews it and swallows it and cries.  My dad drops it in her mouth.  Just one.  He says, '[A.M.] take it.  Don't spit it out.'  Then he drops it in her mouth . . .

W.M. said H.G.'s account of the hot sauce was "exaggerated," and he denied "a holding down and forcing it down their throat."  When asked if A.M. willingly swallowed the hot sauce, W.M. said "she wouldn't be willing, no.  I told her it's her punishment, she's got to open her mouth and swallow it."  He also could not say the precise amount of hot sauce, "but it wasn't very much at all."  D.F. also admitted to giving A.M. "hot sauce for lying."  D.F. testified that it was appropriate to put hot sauce in a child's mouth.  She did not know if that was a practice she would continue with her own children.

During the interview with Almond, H.G. stated that A.M. "was being bad at Christmas" so she still has some unopened presents.  "If [A.M] behaves she gets to open a present."  W.M. said it was D.F.'s idea to withhold A.M.'s Christmas presents, "but I did agree to it."  The behavior that prompted the withholding of the presents was that A.M. "was continuously not asleep, not in bed, but she would keep peeing herself, she wouldn't listen."

9

H.G. told Almond that A.M. "also has to do exercises if she lies." The exercises included wallsits and pushups. H.G. demonstrated these exercises and an exercise where A.M.'s legs were stretched out on the floor and she was required to touch her nose to the floor between her legs. W.M. said the exercises "were recommended by therapy, but [A.M.] did not like to do them, so she ended up doing some of them" for punishment.

When A.M. is thirsty "she doesn't ask my mom, so she drinks out of the toilet." H.G. explained that "my mom says that you better ask nicely for your drink. [A.M.] doesn't ask for a drink with manners because my mom taught us how to have our manners, but [A.M.] doesn't have any manners."

The Department developed a service plan for W.M. and he completed most of his court-ordered services including individual and couple's counseling with Stephen Jennings.[7] From the outset of counseling, W.M. and D.F. described A.M. as "a problematic child that creates problems for the home."

W.M. began individual counseling with Jennings on July 5, 2017. W.M. told Jennings that he did not believe D.F. burned A.M.'s hand, stating, "she's not a bad person," and he would defend his wife. W.M. was not open to the idea that D.F. burned A.M. Jennings' impression was that W.M. decided to believe his wife over A.M. because A.M. was "troubled," and D.F. was being more honest than A.M. about what happened.[8]

---

[7] According to the service plan, W.M. was required to: abstain from the use of illegal drugs; submit to random drug screens; locate stable housing and employment; take parenting classes; participate in a substance abuse assessment with Outreach, Screening, Assessment, and Referral (OSAR) and follow recommendations; complete a psychological evaluation; attend individual and couple's counseling; participate in rational behavior therapy (RBT); attend anger management classes; and attend visits with A.M.

[8] Although W.M. was told in therapy with Jennings about D.F.'s confession to Lieutenant Chappell and that A.M. had told others that D.F. burned her, W.M. refused to believe that D.F. burned A.M. until D.F.'s confession to police was played at trial.

D.F. also counseled with Jennings. Initially, D.F. told Jennings that A.M. burned herself by turning on the water in the sink to wash her hands. Jennings confronted D.F. in a later session about her confession to the police that she had placed A.M.'s hand under the hot water. D.F. responded that she was confused when she spoke to the police the second time. She also maintained that A.M. was not being honest in her outcries.

Alex Guidry, the visitation coordinator at Amarillo Area Court Appointed Special Advocates (CASA)[9] testified that she monitored visits[10] between W.M. and A.M.[11] During the visit on September 11, 2017, A.M. told W.M., "I don't like jalapeños, ya'll used to give me some though." W.M. told A.M. that "she loved it." At one point during the visit, Guidry observed W.M. whispering to A.M. As the visit was concluding, W.M. told A.M., "Your momma and them miss you too. Your momma wishes she could come see you." W.M. told A.M., "They think she's the one that burnt your hand."

After the visit, A.M. was reluctant to leave the visitation room. Tina Hernandez, a CASA supervisor, was asked to assist in getting A.M. out of the room and taking her to her aunt Kathy who was waiting for A.M. at the end of the hall. Hernandez asked A.M. to come with her, but she was "very reluctant, very resistant. She stood against the wall." A.M. eventually followed Hernandez down the hall, then A.M. stopped and laid on the floor. Hernandez could not get A.M. off the floor, so she waved to Kathy to come to A.M. Kathy reached down to pick up A.M. from the floor and A.M. "wrapped her arms around

---

[9] A CASA volunteer is appointed by the judge to make independent, unbiased, and informed recommendations to help the judge decide the best interest of a child who has been abused or neglected.

[10] The visits are videotaped, and notes made by the monitor are provided to CASA staff and the Department to address any issues raised during the visits. Parents are admonished to keep the visits positive and to refrain from discussing the case with the child.

[11] W.M. missed six visits with A.M. during the pendency of this case. D.F. was not allowed to visit with A.M.

[Kathy's] neck and just let out the biggest, saddest cry I have ever heard stating, 'Dad said [D.F.] didn't burn me. He said I did it.'" Hernandez testified, "I was concerned for A.M. just being so sad and torn that her dad did not believe her over the incident that happened to her hand. She was truly heartbroken and in tears. She cried so hard she couldn't catch her breath."

Beginning on September 5, 2017, A.M. participated in trauma-focused cognitive behavioral therapy with Lee Ann Lefevre, a licensed professional counselor. Lefevre opined that A.M. suffered from post-traumatic stress disorder and adjustment disorder with anxiety due to physical abuse causing her developmental progress to be delayed. This manifested itself by causing A.M. to have intense stress and be unable to make transitions from one environment to the next:

> She did not have the self-esteem or the confidence within herself to go from aunt's care to counseling, counseling to day care, day care to home. Every transition that was required of her was monumental, and she appeared terrified as to what would happen in each transition. And she would either have a tantrum or would just fall to the ground and lie on the ground in a very passive stance and not move, because she did not know how to make those very simple transitions.

A.M. was experiencing extraordinarily intense night terrors and she would wake up screaming many times throughout the night. A.M. was verbally hostile to herself, and she vocalized her feelings by singing to herself, "I am bad. I am a bad girl. I am not with daddy because I am bad." She would also sing about her hands and that her hands were hurt and she was sad. In Lefevre's opinion, A.M.'s behavior was indicative of complex trauma, not a single traumatic event. "She has lived in a situation that is unsafe or unstable for so long that she has to be self-protective."

12

In A.M.'s first session with Lefevre, A.M. said she lived with her aunt Kathy "because [D.F.] was very mean to me, and she hurt my hand." Lefevre noted that the skin on A.M.'s right hand is marbled. It looks as if it has been burned. It bothers A.M. and she looks at it frequently. Lefevre credits Kathy with doing a great job of implementing therapeutic suggestions. A.M. is happy and safe in Kathy's home.

Lefevre testified that at the session with A.M. on September 19, 2017, A.M. was noticeably upset, agitated, and anxious. After a visit with W.M. a few days before, A.M. was sad because her dad did not believe that D.F. hurt her. "She did not understand why he didn't believe her, and she did not understand why dad was with [D.F.] because [D.F.] was mean and hurt her." According to Lefevre, W.M.'s refusal to believe A.M. was detrimental to A.M. and undermined A.M.'s progress in therapy. A.M. had gone without wetting the bed for quite a while, and she immediately started wetting the bed again. She was also having tantrums to a greater degree and intensity than she had been having after the interaction with her father at the visitation. Later in this session A.M. told Lefevre that D.F. "told her not to tell anybody that she had done this to [A.M.]."

Lefevre opined that "it is emotionally abusive for a child to tell you that they have been abused and for an adult to try to get that child to change their story." She explained:

> To report to people that are supposed to keep you safe that you are being hurt and them to negate that are much more difficult to overcome, because it undermines their ability to trust caregivers and others that are supposed to be protective. The burning of her hands was awful. Negating the fact that her hands were burnt by [D.F.] was catastrophic in her ability to trust people that they will keep her safe.

According to Lefevre, this type of behavior by a parent constitutes conduct that would endanger a child's emotional or physical well-being. The regression with the

13

bedwetting was an indication that A.M. was upset and felt unsafe so she reverted to previous behaviors. A.M. does not like to wet the bed or wet herself on purpose, because she told Lefevre that "she used to have to sit in an ice-cold bath when she wet the bed when she lived with her dad and [D.F.], that was her punishment." Lefevre concluded that A.M.'s dysfunction was not based on a single incident, but was the result of an ongoing situation based on A.M.'s description of her maltreatment in the home.

A.M. is placed with W.M.'s sister, Kathy, in an adoptive placement. A.M. feels safe with Kathy and A.M. wants to stay with her. A.M. completed occupational therapy for her hand and sees a therapist twice a month to help her process the reasons that she was removed from the home of W.M. and D.F. While W.M. opposes the termination of his parental rights, he does not ask for A.M. to be returned to him but agrees that she should stay with Kathy for now.

The trial court terminated W.M.'s parental rights on the grounds of endangering conditions, endangerment, and failure to comply with a court order that established actions necessary to retain custody of the child. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (O) (West Supp. 2017).[12] The trial court also found that termination was in the child's best interest. *See* § 161.001(b)(2).[13]

---

[12] Further references to provisions of the Texas Family Code will be by reference to "section __" or "§ __."

[13] B.A. signed an affidavit of voluntary relinquishment and her parental rights were also terminated. She does not appeal. In a separate cause number, the court approved an agreement appointing D.F.'s grandparents as permanent managing conservators of H.G., N.M., S.M., and E.M., and appointing W.M. and D.F. as possessory conservators with supervised visitation.

APPLICABLE LAW

A parent's right to the "companionship, care, custody, and management" of his or her child is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758-59, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *see In re M.S.,* 115 S.W.3d 534, 547 (Tex. 2003). Consequently, we strictly scrutinize termination proceedings and strictly construe the involuntary termination statutes in favor of the parent. *Holick v. Smith,* 685 S.W.2d 18, 20 (Tex. 1985). However, "the rights of natural parents are not absolute" and "[t]he rights of parenthood are accorded only to those fit to accept the accompanying responsibilities." *In re A.V.,* 113 S.W.3d 355, 361 (Tex. 2003) (citing *In re J.W.T.*, 872 S.W.2d 189, 195 (Tex. 1993)). Recognizing that a parent may forfeit his or her parental rights by his or her acts or omissions, the primary focus of a termination suit is protection of the child's best interests. *See id.*

In a case to terminate parental rights by the Department under section 161.001 of the Family Code, the Department must establish, by clear and convincing evidence, that (1) the parent committed one or more of the enumerated acts or omissions justifying termination, and (2) termination is in the best interest of the child. § 161.001(b). Clear and convincing evidence is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." § 101.007 (West 2014); *In re J.F.C.,* 96 S.W.3d 256, 264 (Tex. 2002). Both elements must be established and termination may not be based solely on the best interest of the children as determined by the trier of fact. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re K.C.B.,* 280 S.W.3d 888, 894 (Tex. App.—Amarillo 2009, pet. denied). "Only one predicate finding under section 161.001[(b)](1) is

15

necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.,* 113 S.W.3d at 362. We will affirm the termination order if the evidence is both legally and factually sufficient to support any alleged statutory ground the trial court relied upon in terminating the parental rights if the evidence also establishes that termination is in the child's best interest. *In re K.C.B.*, 280 S.W.3d at 894-95.

The clear and convincing evidence standard does not mean the evidence must negate all reasonable doubt or that the evidence must be uncontroverted. *In re R.D.S.*, 902 S.W.2d 714, 716 (Tex. App.—Amarillo 1995, no writ). The reviewing court must recall that the trier of fact has the authority to weigh the evidence, draw reasonable inferences therefrom, and choose between conflicting inferences. *Id.* The factfinder also enjoys the right to resolve credibility issues and conflicts within the evidence and may freely choose to believe all, part, or none of the testimony espoused by any particular witness. *Id.* Where conflicting evidence is present, the factfinder's determination on such matters is generally regarded as conclusive. *In re B.R.*, 950 S.W.2d 113, 121 (Tex. App.—El Paso 1997, no writ.).

The appellate court cannot weigh witness credibility issues that depend on demeanor and appearance as the witnesses are not present*. In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). Even when credibility issues are reflected in the written transcript, the appellate court must defer to the factfinder's determinations, as long as those determinations are not themselves unreasonable. *Id.*

STANDARDS OF REVIEW

When reviewing the legal sufficiency of the evidence in a termination case, the appellate court should look at all of the evidence in the light most favorable to the trial court's finding "to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.,* 96 S.W.3d at 266. To give appropriate deference to the factfinder's conclusions, we must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so. *Id*. We disregard all evidence that a reasonable factfinder could have disbelieved or found to have been not credible, but we do not disregard undisputed facts. *Id.* Even evidence that does more than raise surmise or suspicion is not sufficient unless that evidence is capable of producing a firm belief or conviction that the allegation is true. *In re K.M.L.,* 443 S.W.3d 101, 113 (Tex. 2014). If, after conducting a legal sufficiency review, we determine that no reasonable factfinder could have formed a firm belief or conviction that the matter that must be proven was true, then the evidence is legally insufficient and we must reverse. *Id.* (citing *In re J.F.C.,* 96 S.W.3d at 266).

In a factual sufficiency review, we must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing. *In re J.F.C.,* 96 S.W.3d at 266. We must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction about the truth of the Department's allegations. *Id.* We must also consider whether disputed evidence is such that a reasonable factfinder could not have resolved the disputed evidence in favor of its finding. *Id.* If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited

in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id.*

ANALYSIS

Sufficiency of the evidence under § 161.001(b)(1)(D), (E), (O)

In three issues, W.M. challenges the legal and factual sufficiency of the evidence to support the termination of his parental rights under section 161.001(b)(1)(D), (E), and (O). Although only one statutory ground is required to support termination, *see In re A.V.*, 113 S.W.3d at 362, we find there is sufficient evidence of multiple grounds in this case to support termination. We will limit our analysis of the sufficiency of the evidence in support of subsections (D) and (E).

A trial court may order termination of a parent-child relationship if the court finds by clear and convincing evidence that a parent has knowingly placed or knowingly allowed a child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child and/or engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child. *See* § 161.001(b)(1)(D), (E). Both subsections (D) and (E) require proof of endangerment. To "endanger" means to expose the child to loss or injury; or to jeopardize the child's emotional or physical health. *Boyd,* 727 S.W.2d at 533. A child is endangered when the environment creates a potential for danger that the parent is aware of but consciously disregards. *J.S. v. Tex. Dep't of Family & Protective Servs.,* 511 S.W.3d 145, 159 (Tex. App.—El Paso 2014, no pet.). Endanger means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, but it is not necessary that the conduct be directed at the child or that the

18

child suffer injury. *In re N.K.,* 399 S.W.3d 322, 330-31 (Tex. App.—Amarillo 2013, no pet).

While both subsections (D) and (E) focus on endangerment, they differ regarding the source of the physical or emotional endangerment to the child. *See In re B.S.T.*, 977 S.W.2d 481, 484 (Tex. App.—Houston [14th Dist.] 1998, no pet.). Subsection (D) requires a showing that the environment in which the child is placed endangered the child's physical or emotional health. *Doyle v. Tex. Dep't of Protective & Regulatory Servs.,* 16 S.W.3d 390, 394 (Tex. App.—El Paso 2000, pet. denied). Conduct of a parent or another person in the home can create an environment that endangers the physical and emotional well-being of a child as required for termination under subsection (D). *In re W.S.*, 899 S.W.2d 772, 776 (Tex. App.—Fort Worth 1995, no pet.). Inappropriate, abusive, or unlawful conduct by persons who live in the child's home or with whom the child is compelled to associate on a regular basis in his home is a part of the "conditions or surroundings" of the child's home under subsection (D). *In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.) (op. on reh'g). The factfinder may infer from past conduct endangering the child's well-being that similar conduct will recur if the child is returned to the parent. *Id.* Thus, subsection (D) addresses the child's surroundings and environment rather than parental misconduct, which is the subject of subsection (E). *Doyle*, 16 S.W.3d at 394.

Under subsection (E), the cause of the danger to the child must be the parent's conduct alone, as evidenced not only by the parent's actions, but also by the parent's omission or failure to act. *In re M.J.M.L.,* 31 S.W.3d 347, 350-51 (Tex. App.—San Antonio 2000, pet. denied); *Doyle*, 16 S.W.3d at 395. To be relevant, the conduct does not have

to have been directed at the child, nor must actual harm result to the child from the conduct. *Dupree v. Tex. Dep't of Protective & Regulatory Servs.,* 907 S.W.2d 81, 84 (Tex. App.—Dallas 1995, no writ). Additionally, termination under subsection (E) must be based on more than a single act or omission; a voluntary, deliberate, and conscious course of conduct by the parent is required. *In re E.P.C.*, 381 S.W.3d 670, 683 (Tex. App.—Fort Worth 2012, no pet.). The specific danger to the child's well-being need not be established as an independent proposition, but may be inferred from parental misconduct. *In re B.C.S.*, 479 S.W.3d 918, 926 (Tex. App.—El Paso 2015, no pet.).

The Department presented evidence that W.M. was neglectful in failing to seek professional health care for five days after A.M. received a second degree burn on her right hand. Instead of promptly seeking medical care, W.M. relied on home remedies and over the counter medication to treat A.M.'s injured hand. W.M. minimized the intensity of A.M.'s pain by stating that she "wasn't crying in excruciating pain" and that the burn "did not look that severe." Despite his assertions that A.M. was not in pain, he claimed they gave her Motrin "every four hours, four to six hours." W.M.'s explanation for not seeking medical attention disregarded the seriousness of A.M.'s condition and did not take her welfare into account. Dr. Patterson testified that a reasonable parent would have sought medical attention for such a severe burn. The failure to provide appropriate medical care for a child may also be considered conduct that endangers a child. *In re D.E.,* 761 S.W.2d 596, 600 (Tex. App.—Fort Worth 1988, no writ). This is true even if the parent did not cause the condition that requires medical treatment. *In re S.H.A.*, 728 S.W.2d 73, 88 (Tex. App.—Dallas 1987, writ ref'd n.r.e.); *Juan A__ v. Dallas County Child Welfare*, 726 S.W.2d 241, 244 (Tex. App.—Dallas 1987, no writ) (mother's failure to obtain medical

treatment for child with severely burned feet constituted conduct endangering child's physical well-being).

The evidence also presented a sordid picture of maltreatment ostensibly used for punishment of A.M. in the home. A.M. was forced to ingest hot sauce and peppers on multiple occasions, perform strenuous exercises, and was prevented from opening her Christmas presents. W.M. not only knew about the targeted treatment of A.M., he participated in it and failed to act to protect her. The emotional and physical abuse took a toll on A.M. and she experienced night terrors, had difficulty transitioning from one environment to the next, and she was verbally hostile to herself. A.M.'s singing to herself that she is "a bad girl" and that she is "not with daddy because I am bad" is a manifestation of the emotional turmoil that A.M. experienced while in the home of W.M. and D.F. Further, A.M.'s behavioral therapist testified that A.M.'s behavior was indicative of complex trauma, not a single traumatic event.

A parent's violent or abusive conduct can produce an environment that threatens a child's well-being. *S.H.R. v. Dep't of Family & Protective Servs.,* 404 S.W.3d 612, 645 (Tex. App.—Houston [1st Dist.] 2012), *aff'd by, In re S.M.R.,* 434 S.W.3d 576 (Tex. 2014) (Brown, J., dissenting).

The trial court could have been persuaded that W.M.'s failure to seek appropriate medical care for the burn and his participation in the hot sauce and pepper punishments was conduct that produced an endangering environment and endangered A.M.'s physical and emotional well-being. The evidence supports the trial court's finding of termination under subsections (D) and (E).

Having examined the entire record, we find that the trial court could reasonably form a firm belief or conviction that W.M. knowingly placed or knowingly allowed A.M. to remain in conditions or surroundings which endangered her physical or emotional well-being and engaged in conduct which endangered A.M.'s emotional and physical well-being. The same evidence is factually sufficient to support the trial court's affirmative finding. Issues one and two are overruled. Having overruled issues one and two, it is unnecessary to address issue three.[14]

CONCLUSION

The judgment of the trial court terminating W.M.'s parental rights is affirmed.


Judy C. Parker
Justice

---

[14] Because only one statutory predicate ground is required to support termination when there is also a finding that termination is in the child's best interest, we need not address W.M.'s challenge to the sufficiency of the evidence to support the trial court's finding of a statutory predicate ground under subsection (O). *See In re A.V.*, 113 S.W.3d at 362; *In re K.C.B.,* 280 S.W.3d at 894-95.